**EXHIBIT 1**



COPY

## IN THE MATTER OF THE ARBITRATION ACT 1996

### AND

## IN THE MATTER OF AN ARBITRATION

BETWEEN:-

We certify this to be a true
copy of the original

Ince eCo
.......................................
Ince & Co., Solicitors
International House
1 St Katharine's Way
London E1W 1UN

### WINTER STORM SHIPPING LTD

**Claimants
(Owners)**

- and -

### TPI OIL (1997) CO LTD

**Respondents
(Charterers)**

### "NINEMIA"

### Charterparty dated 26 February 2001

---

### AWARD OF COSTS

---

**W H E R E A S:-**

1.    By a voyage charterparty on an amended Asbatankvoy form dated Singapore

26 February 2001, the Claimants (hereinafter referred to as "the Owners")

chartered the "NINEMIA" to the Respondents (hereinafter referred to as "the

Charterers") to carry a cargo of no heat crude oil from, in the event, Rabigh Bay, Saudi Arabia to Rayong, Thailand.

2.    The said charterparty provided, inter alia, that should any disputes arise between the parties, they were to be referred to arbitration in London, each party appointing an arbitrator and a third being appointed by the two so chosen.

3.    Disputes arose between the parties as detailed hereafter. The Owners appointed me, Bruce Harris now of Flat 101, 7 High Holborn, London, WC1V 6DR, as the arbitrator nominated by them. The Charterers appointed me, Mark Hamsher of 18c Ensign Street, London, E1 8JD, as the arbitrator nominated by them. We, the said arbitrators, in turn appointed the undersigned Christopher Moss of 4 Charlotte Place, Wilton Road, London, SW1V 1DP as the third arbitrator. The seat of the arbitration was in London.

4.    The Owners claimed US$205,757.90 that had been withheld from freight by the Charterers who relied upon clause 15 of the charterparty, together with interest and costs. The Charterers denied liability for the claim.

5.    On 17 October 2006 we published an award in which we found that the Owners' claims succeeded in the reduced amount of US$108,449.80. We awarded and adjudged that the Charterers were to pay that sum to the Owners together with compound interest thereon.

- 3 -

6. We expressly reserved to ourselves the jurisdiction to make a further award or awards in respect of all issues relating to the costs of the parties and ultimate liability for the costs of our award in the amount of £33,156 (including room hire and catering of £2,196).

7. On 21 November 2006 the Owners' London solicitors, Messrs Ince & Co, sent a fax to us with a copy to the Charterers' London solicitors, Messrs Clyde & Co, asking us to make an order that their recoverable costs and the costs of the award should be paid by the Charterers. No comments were received from Messrs Clyde & Co.

8. On 8 December 2006 the undersigned Mark Hamsher, on behalf of the tribunal, sent a fax to Messrs Ince & Co with a copy to Messrs Clyde & Co in the following terms:-

   "...

   Unless Clydes advise us to the contrary, we shall assume that although they may have no instructions at the moment, they have not been disinstructed so that any messages to the charterers can be addressed to Clydes in the usual way. We accept that, prima facie, your clients are entitled to their costs for the reasons set out by you. This is, of course, only a preliminary view subject to considering any submissions that may be served by or on behalf of the charterers on the point.

Fax sent by : 02077022520          MARK HAMSHER          23-02-07 12:15          
`Case 1:01-cv-05650-SAS          Document 39-2          Filed 04/13/2007          Page 5 of 22

- 4 -

We suggest that the best way forward is for you to draw up a schedule of the costs that you claim in the usual format. We shall then lay down an appropriate time limit for them to respond both on the principle of your claim as well as on the quantum of the costs claimed. If no submissions are received, we would lay down a final and peremptory order with a short time limit and then proceed to a formal assessment in an award of costs on the basis of whatever documents have been received by the expiry of the time limit. That seems to us to be the most straightforward and cost effective way of proceeding."

9.     On the same date, we received a fax from Messrs Clyde & Co in the following terms:-

"We refer to Ince's faxes to you regarding Costs.

We do not have instructions from our clients at the moment but we may at some stage in the future receive instructions. In the past, it has always been difficult to obtain instructions and this particular delay is similar to what has previously happened.

From our own point of view and without instructions, what we can say is that we would be very surprised if the Tribunal were to award

Inces all their costs particularly given the somewhat Pyrrhic victory.
Most of the legal expense was incurred in connection with issues on
which the Claimants were unsuccessful.

If we do receive formal instructions we will of course make proper
submissions."

10.   On 11 December 2006 we sent a fax to the parties' solicitors advising that we did
not think that it was appropriate to alter the directions previously made by us;
Messrs Clyde & Co/their clients would have an opportunity to respond both on the
principle of the recovery of costs as well as on the quantum of the costs claimed
once the schedule had been served.

11.   On 20 December 2006 Messrs Ince & Co served a schedule in support of the
Owners' claim for recoverable costs, which will be considered in greater detail
below. In their covering letter, they asked for an award of those costs. They
commented that the Owners had made a substantial recovery, having been
awarded US$108,449.80 of the US$205,757.90 claimed. They also commented
that in our award we had held the Charterers to have been in breach of the
charterparty and liable for a substantial part of the cargo which was not
discharged. They argued that, in no sense, could this be described as a "Pyrrhic
victory".

- 6 -

12.     In a fax of 21 December 2006 the undersigned Christopher Moss, on behalf of the
        tribunal, directed that if Messrs Clyde & Co or their clients wished to comment on
        the schedule, they should ensure that their comments were with the tribunal by no
        later than close of business on 12 January 2007.

13.     In a fax of 15 January 2007 Messrs Ince & Co reminded us that submissions in
        response to the claim for costs had not been served. In a fax of 24 January 2007
        addressed to Messrs Clyde & Co, the undersigned Mark Hamsher, on behalf of
        the tribunal confirmed:-

                "... you may have until close of business on 31 January to serve any
                submissions in response to the claim for costs. This time limit is
                laid down in final and peremptory terms. If it is not complied with,
                we shall then proceed to our award on the basis of the submissions
                now before us."

14.     Unfortunately, apart from the brief comments served by Messrs Clyde & Co in
        their fax of 8 December 2006 quoted in paragraph 9 above, no submissions were
        ever received from or on behalf of the Charterers in response to the claim for
        costs. We were, however, satisfied that the Charterers had been given every
        reasonable opportunity of serving submissions and that we properly could and
        should proceed to our award of costs even in the absence of any submissions from
        them. In addition, although the fax of 8 December 2006 from Messrs Clyde & Co

was said to have been sent without instructions, it was appropriate for us to take it into account.

15.    Before considering the detail of the costs claimed, it is appropriate for us to consider the point raised by Messrs Clyde & Co, namely that it would not be appropriate to award the Owners all their costs because of their "somewhat Pyrrhic victory". Messrs Clyde & Co asserted that "most of the legal expense was incurred in connection with issues on which the [Owners] were unsuccessful."

16.    In so far as it should be necessary to review in greater detail the issues considered at the hearing leading to our award of 17 October 2006, reference can be made to the reasons that formed part of it and were incorporated into it.

17.    In this award, we shall simply summarise the issues. There was an issue between the parties as to the effect of clause 15 of the charterparty, which provided in part:-

        "In case the ROB is more than the OBQ the CIF value of the difference shall be deducted from freight payment".

        Was it analogous to a certificate final clause? We did not accept the Charterers' arguments on this point. We concluded that it merely gave the Charterers a right of set off from freight and did not provide for final determination of ROB. The Charterers therefore lost on this first issue.

Fax sent by : 02077022520          MARK HAMSHER          23-02-07 12:10     Pg     ....

`Case 1:01-cv-05650-SAS     Document 39-2     Filed 04/13/2007     Page 9 of 22

- 8 -

18.  The second issue was whether, in loading cargo that was described as "reduced crude" at Rabigh Bay, the Charterers had complied with the charterparty warranty that the cargo to be loaded was to be "NHC" (no heat crude). We concluded that the fact that such cargoes are sometimes carried without heating was not sufficient to make this cargo code NHC. We were satisfied that it is generally and customarily heated and that it had been the objective intention of the parties that the Charterers were not to load a cargo that had the properties of the cargo actually loaded. Contrary to the Charterers' case, we therefore found that they were in breach of that charterparty obligation.

19.  Of course, the above conclusion still left open the question of whether the substantial quantity of cargo that was remaining on board on the completion of discharge was attributable to the characteristics of the cargo or to the characteristics of the vessel and the manner in which discharge had been carried out.

20.  We concluded that at least a significant proportion of the cargo that was left on board was actually still liquid and should have been pumpable. Furthermore, we accepted as valid some of the Charterers' criticisms of the steps taken by the chief officer to discharge all of the cargo. We also accepted the Charterers' case that there were defects in some of the vessel's equipment. We concluded that it was impossible to calculate with precision how much the cargo remaining on board would have been discharged, given a properly functioning vessel and a properly

conducted normal discharge. We concluded that it was fair and reasonable to disallow 4,000 barrels out of the 4,490 found remaining on board in number 4 starboard tank. On that basis, 4,458 barrels of ROB were attributable to the characteristics of the cargo which, based on the FOB value of the cargo, meant that the Owners' claim succeeded in the amount of US$108,449.80.

21.     This was not a case in which the Charterers had made a sealed offer or any offer that had a bearing on liability for costs. Did the result of the case mean that the Owners should be deprived of some of the costs of which they would normally, as the successful party, be entitled?

22.     Arguably the issues concerning the proper construction of clause 15 of the charterparty and whether or not the cargo loaded complied with the charterparty description of the cargo of being "NHC" were separate issues in respect of which a separate costs order might have been appropriate. However, on both those issues the Charterers had been unsuccessful.

23.     We did not think that the rest of the case, which was concerned with considering what proportion of the cargo remaining on board was attributable to problems with the vessel and what proportion was attributable to problems with the cargo, could be considered on a sub-issue by sub-issue basis. The Owners had recovered approximately half their claim. No doubt that was considerably less than they had hoped for. However, we considered that a party that recovers US$108,449.80 together with compound interest for a period of approximately five and a half

Fax sent by : 02077022520          MARK HAMSHER          23-02-01 12:11          Pg : 112 222
·Case 1:01-cv-05650-SAS          Document 39-2          Filed 04/13/2007          Page 11 of 22

- 10 -

years has been substantially successful. We were satisfied that, in the absence of any offers that could have an effect on costs, the Owners were entitled to recover their properly recoverable costs in full without any reduction being applied because of the outcome of the case.

24. At the time that the discharge occurred, the Owners were advised by the Singapore office of Messrs Ince & Co. A solicitor from the Hong Kong office flew to Singapore between 4 and 7 April 2001 to prepare a draft statement for the chief officer and to review matters with the Owners' expert. The case was taken over by the Piraeus office of Messrs Ince & Co on 18 December 2003, or at least that was the date of the first item of work claimed for by that office. The partner handling the file in the Piraeus office transferred to London on 31 December 2004 and the file moved with him.

25. The narrative of the work done was divided into various charging periods and it will be most straightforward to review the costs claimed by reference to the individual charging periods.

26. Before doing so, we should make a general point. When arbitrators are asked to assess costs, it is accepted that they can only do so on a relatively broad brush basis. In general, as in this case, one can assume that the time claimed was actually spent by the case handlers in question. As always, the issue that arbitrators have to address is whether the time was reasonably spent.

27. The first charging period ran from 18 December 2003 to 18 May 2004. The partner was charged at the rate of Euros 375 per hour and the assistant solicitor at the rate of Euros 270 per hour. (The schedule contained a typographical error, indicating a charging rate of Euros 275 per hour for the partner, but the other figures made it clear that the charging rate was in fact Euros 375 per hour.) No objection could be taken to the charging rates which were certainly no higher than the rates charged by solicitors in the City of London specialising in commercial maritime litigation, who could always have been instructed by the Owners. Indeed, the rates may have been lower than those charged by their London counterparts.

28. The claim was for 9 hours for the partner and 11.40 hours for the assistant solicitor. It did not seem to us to be appropriate to take a narrow view of the work done during this period, which was clearly designed to achieve a settlement with direct negotiation with the Charterers through Thai lawyers. Although it might be argued that those costs were not strictly costs in the reference, if London solicitors engage in settlement negotiations during the course of the reference, there is no reason why time spent on those negotiations cannot be claimed. The costs in question seem to be for very similar work and it was therefore not appropriate to disallow them on that score.

29. However, we were surprised at the amount of time spent both by the partner and the assistant solicitor. It sometimes make sense for a partner to handle a matter on his or her own on the basis that the partner's greater experience will lead to

Fax sent by : 82877822520    MARK HANSHER    29-02-07 12.21
.Case 1:01-cv-05650-SAS    Document 39-2    Filed 04/13/2007    Page 13 of 22

- 12 -

matters being dealt with more sufficiently swiftly to justify the higher charging rate. Alternatively, a partner can supervise a suitably experienced assistant solicitor. Reviewing the schedule, it seemed to us that there were many occasions on which both the partner and the assistant solicitor were so involved that the involvement of the partner went considerably beyond the supervision that one would normally expect. It seemed to us to be appropriate to allow only 5 of the 9 hours claimed for the partner, while allowing the time of the assistant solicitor in full. The fees for this charging period therefore had to be reduced by £1,013.51.

30. The second charging period was from 13 May 2004 to 19 October 2004. The charging rates were the same and there could be no objection to them. The Owners claimed 10.20 hours for the partner and 14.43 hours for the assistant solicitor. The same point about such close involvement of the partner applied. With such close involvement, there must inevitably have been a degree of duplication. We considered that no more than 6 hours should be allowed for the partner albeit the assistant solicitor's time should be allowed in full. The recoverable fees for this period therefore had to be reduced by £1,093.75.

31. The third period was from 20 October 2004 to 29 December 2004 (the references to October 2005 in the heading apparently being a typographical error). The charging rates were again Euros 375 and Euros 270 per hour for the two case handlers. At this stage in the reference, after service of the defence submissions, we considered that additional partner time was justified, although not the full 5.6 hours claimed when the assistant had spent 12.11 hours. We were prepared to

allow 4 hours for the partner. The fees for this period therefore had to be reduced by £416.66.

32.     The fourth period ran between 7 January 2005 and 18 October 2005; it covered the period of the transfer of the case to the London office. We had no quarrel with the charging rates of £285 per hour for the London partner involved, £275 per hour for the partner who had transferred from Piraeus and for the two assistants at £220 per hour. However, it seemed to us that the time spent by the individuals covered either a considerable amount of duplication and/or unjustified partner involvement and/or new case handlers reading into the file. Admittedly this was a time when the solicitors were obviously closely involved with the expert and it was a time when the final preparations for the hearing were being made. However, that could not justify 7.5 hours for the London partner, 42.40 hours for the partner who had come back from Piraeus, 51.1 hours for one assistant and 12.2 hours for the other assistant. Given the involvement of the partner who had been in Piraeus, we could see no basis for allowing for the involvement of a second partner in London. For the partner who had come back from Piraeus to have spent more than a solid working week on the matter was not an efficient use of partner time that could properly be recovered, particularly bearing in mind that the partner had been involved for a considerable period and would presumably have had a sure grasp of all the issues and the direction that the case should take. We considered that 25 hours for the partner would have been a reasonable time. We could not see the justification for two assistants to have spent a total of 63.3 hours. We were prepared to allow the fees of one assistant for 40 hours. We therefore

disallowed 7.5 hours (at £2,137.50) for the London partner and 17.4 hours (at £4,785) for the partner who had moved from Piraeus. We disallowed 23.3 hours (at £5,126) for the assistants. The fees for this period had to be reduced by a total of £12,048.50.

33.     The fifth period between 18 October 2005 and 27 April 2006 covered the final preparation for the hearing and the hearing itself. By now there was only the London partner involved and we had no quarrel with his charging rate of £285 per hour. There was only one assistant solicitor charged at £220 per hour and one trainee solicitor at £130 per hour. All the charging rates were reasonable. However, we had considerable concerns about the total of 53.7 hours spent by the partner, 46.8 hours spent by the assistant solicitor and 71.50 hours spent by the trainee solicitor. Although the case was not without its technical difficulties, the Owners had the benefit of an expert and counsel both of whose fees were included in the disbursements. It seemed to us to be appropriate to allow no more than 35 hours for the partner and 30 hours for the assistant. Their fees therefore had to be reduced by £5,329.50 and £3,696, a total of £9,025.50.

34.     In general, we allow very little for time spent by trainee solicitors because, inevitably, their lack of experience means that they cannot contribute on a very cost efficient basis to a team's efforts. That is, of course, no criticism of trainee solicitors in general or the trainee solicitor in this case. One cannot expect a trainee to work as fast as an experienced solicitor because they are, by definition, still being trained. However, that does not mean that all their time should be

recoverable, even if their charging rates are intended to reflect their lack of experience. Having said that, trainee solicitors do have a valid role to play in hearings and in the preparation of, for instance, bundles. We were prepared to allow 35 hours of the 71.50 hours claimed. The fees therefore had to be reduced by £4,745.

35.    The final period from 20 April 2006 to 24 October 2006 covered the final period from the publication of the award to the preparation of the schedule of costs. We were prepared to allow the costs claimed during that period in full.

36.    Of the total fees of £77,664.76 of Messrs Ince & Co, we were prepared to allow £49,321.84.

37.    We are conscious of the fact that the above finding may seem harsh to Messrs Ince & Co and/or their clients. We recognised that this was a far from straightforward claim for the Owners to pursue because there were admitted defects in the ship's equipment, certain admitted errors in the way discharge was carried out and admitted inaccuracies in the pumping logs. However, it was always a relatively modest claim. It was not clear to us why it had had so much time, particularly partner time, devoted to it. Perhaps the Owners or their Club are particularly important clients of Messrs Ince & Co. Whatever the explanation we could only allow such costs as were reasonably spent on pursuing what is, by today's standards, a relatively modest claim with the benefit of considerable input from experts and counsel. A claim for just over US$200,000 that eventually led to

- 16 -

a three day arbitration could not justify a total of 128.40 hours being devoted to it by two partners, a total of 148.40 hours by a number of assistants and 71.50 hours by a trainee. That equated to just under ten 35 hour "people weeks" devoted exclusively to this case!

38.   The Owners sought to recover disbursements in the total amount of £109,932.64. We were prepared to allow the great majority of the disbursements which were properly substantiated by invoices. However, some are considered separately below.

39.   The Owners claimed counsel's fees of £24,710. A few years ago that figure would have been considered very high for a senior barrister who is not a QC handling a three day arbitration. However, our experience is that counsel's fees have, in recent years, increased considerably. It is also true that counsel are now more actively involved in every stage of the preparation of a case and not just with its presentation of the hearing. Since the fees were in line with current market rates we were prepared to allow them in full.

40.   The Owners also claimed the fees of the experts instructed by them, CWA, in the amount of £34,937.83. Those appear to be calculated at an hourly rate of £135 per hour. There could be no complaint about the charging rate and the truth of the matter is that preparation of this case and its proper presentation at the hearing was crucially dependent on expert evidence. Having reviewed the invoices and

the time spent, including a trip to Athens to review documentation, we were prepared to allow the costs in full.

41. There was a claim for US$27,215 for the fees incurred by Messrs Ince & Co in Hong Kong for sending someone to Singapore to investigate with the master the course of the pollution incident and high ROB during discharge. It was not clear to us why someone had to fly from Hong Kong nor why he had to spend from 4 to 7 April investigating matters. As the invoice made clear, in part the invoice related to investigating the pollution, which did not concern the claim against the Charterers. We therefore concluded that only half the costs claimed should be recoverable, namely £9,719.64.

42. There was a further claim for the sterling equivalent of US$14,046.29 charged by the Singapore office of Messrs Ince & Co. It was difficult for us to identify specifically where that figure came from. In a letter to the managers of the Owners' P&I Club, Messrs Ince & Co explained that their total invoice of US$59,691.35 should be apportioned on the basis of US$21,698.71 relating to oil pollution and US$37,992.64 relating to the claim against the Charterers. The claimed figure of US$14,046.29 was significantly lower than the figures in the invoice and in the explanatory fax of 14 June 2001. We were therefore prepared to allow the sum claimed in full.

43. The disbursements therefore had to be reduced by £9,719.64 to £100,213.

Fax sent by : 02077022520

Case 1:01-cv-05650-SAS    Document 39-2    Filed 04/13/2007    Page 19 of 22
- 18 -

44.   Finally, the Owners claimed reimbursement of the costs of our award which they had borne in the first instance in the amount of £33,156. In line with our conclusion that the Owners were entitled to recover their properly recoverable costs in full, the Owners were also clearly entitled to recover the costs of our award in full.

45.   The Owners' claim for costs therefore succeeded in the reduced amount of £182,690.84. Although we had not allowed the Owners' claim in full, they had nevertheless been substantially successful and it was therefore appropriate that the costs of this our award of costs should be borne by the Charterers.

46.   Interest could only be awarded from the date of determination of liability for costs, namely the date of this award.

47.   NOW WE, the said Bruce Harris, Mark Hamsher and Christopher Moss, having taken upon ourselves the burden of this reference, having reviewed the schedule of costs and considered the comments of the parties, DO HEREBY MAKE, ISSUE AND PUBLISH this our FINAL AWARD OF COSTS as follows:-

A)   WE FIND that the Owners' claim for costs and disbursements succeeds in the reduced amount of £ 182,690.84 and no more.

B)    WE THEREFORE AWARD AND ADJUDGE that the Charterers shall forthwith
       pay £182,690.84 (One Hundred and Eighty Two Thousand Six Hundred and
       Ninety Pounds Sterling and Eighty Four Pence) to the Owners.

C)    WE FURTHER AWARD AND ADJUDGE that the Charterers shall bear the
       costs of this our award of costs in the amount of £5,175 PROVIDED THAT if, in
       the first instance, the Owners shall have borne any part of the said costs of this
       our award of costs they shall be entitled to immediate reimbursement by the
       Charterers of the sum so paid.

D)    WE FURTHER AWARD AND ADJUDGE that the Owner shall be entitled to
       compound interest on £182,690.84 and on any sums payable to them under
       paragraph C above at the rate of 7.75% per annum compounded at three monthly
       rests from the date of this award until the date of payment or reimbursement as
       appropriate.

GIVEN under our hands in London this    22nd    day of February 2007

.........................................................    ..................................
Bruce Harris                                                 Witness

.........................................................    ..................................
Mark Hamsher                                                 Witness

.........................................................    ..................................
Christopher Moss                                             Witness

<u>IN THE MATTER OF THE
ARBITRATION ACT 1996</u>

<u>AND</u>

<u>IN THE MATTER OF AN
ARBITRATION</u>

B E T W E E N :-

**WINTER STORM SHIPPING
LTD**

<u>Claimants</u>
**(Owners)**

- and -

**TPI OIL (1997) CO LTD**

<u>Respondents</u>
**(Charterers)**

"NINEMIA"

<u>Charterparty dated
26 February 2001</u>

---

**AWARD OF COSTS**

---